UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANDREW LATTARULO, <br><br> Plaintiff, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY; <br><br> TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; <br><br> RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; <br><br> JOHN DOE 1, in his official capacity as an agent of U.S. Immigration and Customs Enforcement; <br><br> JOHN DOE 2, in his official capacity as an agent of U.S. Immigration and Customs Enforcement; <br><br> JOHN DOE 3, in his official capacity as an agent of U.S. Immigration and Customs Enforcement; <br><br> JANE DOE, HSI ID NO.: 11049, in her official capacity as an agent of Homeland Security Investigations; and <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendants. | C.A. No.: 1:25-cv-12861 |

### PLAINTIFF'S REPLY BRIEF IN SUPPORT OF HIS <u>EMERGENCY</u> MOTION TO RETURN AN ATTORNEY'S UNLAWFULLY SEIZED CELL PHONE AND TO <u>ENJOIN THE SEARCH OF THE ATTORNEY'S CELL PHONE</u>

The Plaintiff filed this emergency motion seeking (1) the immediate return of his unlawfully seized phone, (2) an immediate stop to any search of the phone, and (3) an order of expungement for all data and information extracted from his phone. While the Plaintiff bears the burden of proof for the Temporary Restraining Order, the Defendants bear the burden of showing that the seizure and search were lawful. They will never be able to meet their burden because the seizure was unreasonable, any search was unreasonable, and keeping whatever data was extracted from that phone is unreasonable.

The Defendants' response fails to provide proof that the federal agents knew of the I-9 investigation when they detained the Plaintiff; it fails to explain what information the Federal Agents reasonably expected to be able to learn from searching an immigration attorney's phone that would help in furtherance of a potential a civil infraction; it fails to justify nor explain why the Federal Agents would not provide their names; it fails to address the privileged information on the phone, including whether the Government employed and followed a privilege protocol. Finally, and perhaps most significantly, it fails to address whether what is supposed to be a limited search has already happened.[1]

Here is what we do know. On September 8, 2025, HSI served Attorney Audai Cote ("Cote"), the registered agent and individual in charge of I-9 compliance at Georges Cote LLP, with a Notice of Inspection. *See Exhibit A* – Affidavit of Audai Cote. On September 12, 2025, Georges Cote provided the government with a subpoena response. *See Exhibit B*, p. 7 – Audai Cote

---

[1] During the hearing before the Court on October 7, 2025, the United States confirmed that its agents had already extracted data from the phone and had returned the physical phone to the Plaintiff. Left unsaid was what, if anything, had already been done with the data by the time the Defendants learned of the Court's Temporary Restraining Order issued on October 3, 2025.

Email dated September 12, 2025. Attorney Lattarulo was not involved in this subpoena response; his name was not included on the correspondence between HSI and the firm. *See Exhibit A*, ¶ 6; *Exhibit B,* p.7-9. On September 25, 2025, Cote is served with a Notice of Suspect Documents and given 10 days to present reasonable steps to verify the identity and/or work authorization of the alleged 117 employees with "suspect" employment eligibility. *Id.* Notably, Georges Cote does not even have 117 employees; of the 117 identified, more than 50 individuals are no longer employed by Georges Cote. *Id.* Additionally, of the individuals who do work at Georges Cote, many are United States citizens, including the Plaintiff's own brother, who was traveling with Plaintiff the day his phone was seized. *Verified Complaint* ¶ 28. His name appears on the Government's list of individuals with "suspect documents" despite being a United States Citizen. This is why the Government's own process is set up to allow Georges Cote to take reasonable steps to verify identity and/or work authorization within ten days.[2] Yet three days later, with seven days left for Georges Cote to dispute clerical errors, Plaintiff was detained, and his phone was seized eight hours after he cleared customs in Aruba.

      The Plaintiff was not even in the country when the Notice was served. *See Exhibit A*, ¶ 10. As he returned to the United States, the Plaintiff was met by Federal Agents who had staked out Terminal C and were waiting for Lattarulo to deplane to ensure they could seize and search his phone without a warrant under the guise of national security. *Verified Complaint* ¶¶ 16-25. Notably, Cote also flew into Logan Airport from Aruba the day before, but his phone was not seized. *See Exhibit A,* ¶14. When the Federal Agents had the opportunity and obligation, they

---

[2] "HSI provides the employer and employee(s) an opportunity to provide documentation demonstrating valid U.S. work authorization if they believe the finding is in error." *See Exhibit C* – Form I-9 Inspection https://www.ice.gov/factsheets/i9-inspection (dated March 3, 2025).

never told Lattarulo that the alleged I-9 inconsistencies were the basis for the search.[3] Nor was this information provided to the Court during the hearing on October 7, 2025. Moreover, even though the Plaintiff asserted that privileged material was on the phone, no one from the Government has reached out to seek clarification "as to the specific files, file types, folders, categories of files, attorney or client names, email addresses, phone numbers, or other particulars to may assist CBP in identifying privileged information." *See Exhibit D* - CBP Directive, § 5.2.1.1 Review and Handling of Privileged or Other Sensitive Material.

To suggest that Plaintiff is the party in this case hiding information where several Defendants concealed their identities, failed to tell Plaintiff why they seized and intended to search his phone (or maybe already have) for a period of 17 days, and now continue to fail to provide information on whether the phone has been searched, if any evidence of criminal activity was identified, and if a privilege protocol has been followed, is difficult to understand.

Georges Cote has never been audited before, meaning if the Government were to find a violation, they would be subject to a $3,000 civil fine per violation, not a criminal charge.[4]

---

[3]     "When a border search of information is conducted on an electronic device, the individual subject to search **will be** notified of the purpose and authority for such search, how the individual may obtain more information on reporting concerns about their search, and how the individual may seek redress from the agency if he or she feels aggrieved by a search." *See Exhibit D* - CBP Directive, § 5.4.1.3 Notification of Border Search [emphasis added].

[4]     Defendants posit that since an audit of the Plaintiff's law firm is underway it gives them the right to use the border search exception to circumvent the Fourth amendment. The reality is that a first-time offense violating 8 U.S.C. § 1324a(f) is highly unlikely to result in criminal prosecution. *See Exhibit C* – Form I-9 Inspection https://www.ice.gov/factsheets/i9-inspection (dated March 3, 2025). The legislative history is clear that these criminal violations must be based on a "pattern or practice" which comes from evidence of "regular, repeated, and *intentional* activities" H.R.Rep. No. 99-682, Part 3, 99th Cong., 2d Sess. (1986), p. 59. During the preliminary stages of an audit, the Government is a far cry from being able to bring criminal charges with the *mens rea* of intent against Plaintiff. Yet another example of why a Court would never have issued a search warrant.

Additionally, actual prosecution of employers for employing immigrants without proper documentation is very rare. The latest data available indicates that from April 2018 to March 2019, eleven individuals (and no companies) were prosecuted in just seven cases. "Since criminal penalties for employers were first enacted by Congress in 1986, few employers have ever been prosecuted under these provisions (8 U.S.C. § 1324a). based on available information, prosecutions have rarely climbed above 15 annually and have never exceeded 20 individuals a year except for brief periods during 2005 under President Bush, and in the first year of the Obama Administration." *See Exhibit E* – TRAC Immigration https://tracreports.org/immigration/reports/559/ (last accessed October 18, 2025).

"Not only are few employers prosecuted, fewer who are convicted receive sentences that amount to more than token punishment. Prison sentences are rare. For example, of the 11 individuals the Justice Department reported

The fact that both men passed through Logan Airport during the same weekend and that Cote was the person to whom HIS directed the I-9 inquiry, and who responded to it, reveals the Defendants' true motives: harassing a vocal immigration lawyer and targeting his clients. The key difference between Cote and Lattarulo is that Cote is not an immigration attorney – he focuses on personal injury – and has never been publicly critical of the administration. Comparatively, the Plaintiff is an immigration attorney with many vulnerable clients and is publicly vocal about the current administration policies. The Federal Agents selected their target not based on reasonable inference and analysis related to an alleged underlying civil penalty, but to shakedown a critic and representative of immigrants who dares to live in a state with Democratic leadership.

Putting aside impure motive and the fact that this I-9 audit was embryonic and likely civil when Federal Agents seized Plaintiff's phone (and now), what reasonable suspicion could these agents have had that the Plaintiff's cell phone contained relevant employment records? None. The government's memorandum is devoid of any explanation beyond cell phones contain a lot of information. That much is true. And precisely because it is true, United States citizens are endowed through the Constitution with protections before the government rummages through their phone, which is tantamount to reading their thoughts and tracking their lives. *See Riley v. California*, 573 U.S. 373, 403 (cell phones "hold for many Americans 'the privacies of life'").

*Riley* decision is more significant today than when the Supreme Court issued it. A reminder: the unanimous *Riley* decision was rendered in 2014 and dealt with cell phones seized in 2009 (Riley), *People v. Riley*, 2013 Call. App. Unpub. LEXIS 1033, * 2 (2013), and 2007 (Wurie),

---

as convicted during the most recent 12-month period for which data are available (April 2018 - March 2019), only 3 were sentenced to serve prison time." *Id.*

    The Government asks this Court to accept that a crime that the Legislature narrowly defined, that is rarely prosecuted, and even more rarely results in prison time, is so important to transnational security that a highly intrusive forensic search should be allowed without a warrant.

*United States v. Wurie*, 612 F.Supp. 2d 104, 105 (D.Mass. 2009). For context, the first iPhone (with a maximum of 8GB storage) was announced by Steve Jobs on January 9, 2007. *Apple Reinvents the Phone with iPhone (Jan. 9, 2007)*.[5] The iPhone that the Federal Agents seized from the Plaintiff was an iPhone 15 Pro Max (with capacity of between 256GB to 1TB storage). Verified Complaint, ¶ 33; *Apple iPhone 15 Pro Max – Tech Specs (undated)*.[6] The technology has advanced exponentially – 32 to 125 times more powerful in terms of storage only – and thereby exponentially increasing the risk to Americans' Constitutional rights from Government intrusion.

All of these points underline the obvious: no Court would issue a warrant to search Attorney Lattarulo's cell phone with the facts provided by the Government in their opposition. This is precisely the point. The Government used a pretextual border search to circumvent legal process. This fails the reasonableness requirement of a search made without a warrant. *United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2017), citing *Riley*, 573 U.S. 385-391("the scope of a warrant requirement should be defined by its justifications."); see also *Arizona v. Gant*, 556 U.S. 332, 351 (2009) ("When the [] justifications" underlying an exception to the warrant requirement "are absent, a [warrantless] search . . . will be unreasonable…").

The constitutional consequences underpinning the Government's argument cannot be overstated. There are an estimated 8.3 million undocumented workers in this country (5.2% of the workforce), meaning they are employed by millions of American businesses. Suppose the Court accepts the Government's justification in the instant matter. In that case, millions of Americans' most private information will now be fair game to be seized, searched, and downloaded by the Government if they fly internationally. Not just their bodies, their clothes, their bags, but every

---

[5] https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/ (last accessed October 18, 2025).
[6] https://support.apple.com/en-us/111828 (last accessed October 18, 2025).

thought captured in a Google search, a notes app entry, a message to a loved one, or a private picture. Plus, inch by inch location information. the Government wants the Court to accept that this expansive and unfettered access to citizens' most private data is in the interest of America's national security. How so? There must be a point at which the nature of the Government investigation is so divorced from the goal of the border search exception that the exception becomes inapplicable. This case exemplifies that point.

## Argument[7]

### I. Defendants lacked the reasonable suspicion required for the non-routine search and data extraction of Plaintiff's phone.

"International travelers certainly expect that their property will be searched at the border. What they do not expect is that, absent particularized suspicion, agents will mine every last piece of data on their devices or deprive them of their most personal property for days (or perhaps week or even months, depending how long the search takes)." *United States v. Cotterman*, 709 F. 3d 952, 967 (9th Cir. 2013).

Reasonable suspicion is defined as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v.* Cortez, 449 U.S. 411, 417-18 (1981). On September 28, 2025, the federal agents did not have particular and objective facts amounting to reasonable suspicion that the Plaintiff had committed or was committing any

---

[7] The Defendants' Opposition attempts to dismiss the Plaintiff's legitimate position that he had already cleared customs eight hours before his detention in Terminal C, by pointing to 19 C.F.R. § 162.6 and Article V of the Agreement between the United States and the Netherlands (on behalf of Aruba) ("the Treaty"). The Plaintiff, however, argues that this point is not as settled as the Defendants wish. For example, 19 C.F.R. § 162.6 states "[a]ll persons, baggage, and merchandise arriving in the Customs territory…" Notably, Plaintiff's detention and seizure of his phone happened in an area with no customs presence, a domestic terminal. Verified Complaint ¶ 26.
  Defendants ask the Court to accept that a domestic terminal in Boston is a Customs territory. Imagine if a citizen clears customs passing from Canada into Minnesota and then files into Terminal C at Logan International Airport. Is Terminal C now a Customs territory simply because the passenger cleared customs 8 hours before landing?
  Moreover, respectfully, any treaty signed between the United States and the Netherlands (on behalf of Aruba) does not supersede the Constitution and legal precedent. Notably, in both 19 C.F.R. § 162.6 and the Treaty require that a post-clearance stop occur only if it is deemed "necessary." Nothing about the Federal Agents' stop was necessary; as such, they should not be allowed to cower behind the border search exception.

7

prosecutable crimes relating to border security. The Defendants possessed and have not offered any evidence that the cellphone seized had a nexus to those crimes.

"The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The Plaintiff contends that the initial seizure of his phone was unreasonable, and that the continued seizure of his data (subject to past and unlimited future search) is also unreasonable without a search warrant.

At the time of the seizure, ICE's own procedures allowed Plaintiff's law firm seven more days to correct the information identified in an audit, suggesting that documents may be "suspect" due to technical deficiencies not substantive violations. Moreover, the federal agents did not seize the phone of the individual at Plaintiff's law firm in charge of I-9 documents, Cote, the individual who received the subpoena from HSI and responded to it promptly, even though he travelled through Logan Airport during the same weekend as Plaintiff, also from Aruba.

Defendants' opposition relies heavily on two cases: *Malik v. U.S. Dept. Homeland Sec.*, 78 F.4th 191 (5th Cir. 2023) and *Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021). Neither case is dispositive of *this* case, especially at *this* stage. Both involve reviewing summary judgment decisions made after discovery. This case is far from that stage in the proceeding and the possibility that the Government will have unfettered and warrantless access to, among other things, privileged information of Plaintiff's vulnerable clients is too high to allow the temporary restraining order to lapse.

8

The facts in *Malik* are meaningfully different. The attorney in *Malik* was searched after his name appeared in connection with an active investigation into an international arms dealer. *Malik v. U.S. Dept. Homeland Sec.*, 78 F.4th 191, 200 (5th Cir. 2023). It is at least more plausible that a connection to an international arms dealer allows for a "search for evidence of either contraband or a cross-border crime," which, according to the First Circuit, are the criteria needed to justify the border search exception to the warrant requirement. *Alasaad*, 988 F.3d at 19. Cross-border crimes do not include a domestic recordkeeping inquiry to a law office in Chelsea, in which the law office had already promptly responded to a subpoena. Instead, the focus of the border search exception relates to dangerous transnational crimes, including drug and human trafficking, child exploitation and pornography, arms smuggling, and threats to national safety. *See United States v. Cotterman*, 709 F. 3d 952, 969 (9th Cir. 2013) (court found that search of a man's electronic devices was reasonable because "TECS alert, prior child-related conviction, frequent travels, crossing from a country known for sex tourism, and collection of electronic equipment, plus the [being on a watchlist for individuals involved in sex tourism] take collectively, gave rise to reasonable suspicion of criminal activity."); *United States v. Molina-Gomez*, 781 F.3d 13, 20 (1st Cir. 2015) (Court found reasonable suspicion that appellant was attempting to smuggle narcotics as (1) this was appellant's third trip in four months (each only for a matter of days) to Colombia, (2) the appellant gave odd and suspicious answers to routine Customs questions (3) the laptop was old and operational, yet it contained no data, and (4) his phones contained text messages involving prior and future money transactions.)

Consider Judge Wilkinson's reasoning in *Kolsuz* cited favorably by the First Circuit in *Alasaad*: "[p]orous borders are uniquely tempting to those intent upon inflicting vivid horrors of mass casualties" and "the danger of highly classified technical information being smuggled out of

9

this country only to go into the hands of foreign nationals who do not wish us well and who seek to build their armaments to an ever more perilous state." *Alasaad*, 988 F.3d at 20, n. 12, citing *Kolsuz,* 890 F.3d at 152 (Wilkinson, J., concurring in the judgment).

What was the vivid horror here? The possibility that employees at Plaintiff's firm submitted the wrong paperwork – a recordkeeping issue of which the Government has no reason to believe there is any relevant evidence on Plaintiff's cell phone. The basis of a reasonable suspicion border search and seizure must have a basis in fact and reasonable limits in scope. *See also United States v. Ramsey*, 431 U.S. 606, 620 (1977) ("The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country.") If a non-routine search becomes "too attenuated" from these historic rationales, it "no longer [will] fall under the exception.'" *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (internal citations omitted).

More analogous to the instant case is the Fourth Circuit's decision in *Aigbekaen.* In *Aigbekaen*, the Government had reasonable suspicion that the individual whose electronics were seized and searched, was engaged in domestic sex trafficking, this included a complaining witness and subpoenaed records that identified the individual. *Id.* at 717-718. Still, the Court found that while there was reason to suspect the individual was involved in grave domestic crimes, the government was not allowed to use the border search exception to avoid the requirements of the Fourth Amendment. *Id.* at 722 ("the reasonableness of requiring law enforcement to secure a warrant before conducting an intrusive forensic search of a traveler's digital device, solely to seek evidence of crimes with no transnational component, is readily apparent.") "The government may not 'invoke [] the border exception on behalf of its generalized interest in law enforcement and combating crime.'" *Id.* at 721 (internal citations omitted).

In *Aigbekaen*, the Court rejected the government's argument that the border search was proper "because sex-trafficking is a crime 'commonly involving cross-border movements'" because "inherent in the notion of *individualized suspicion* is some evidentiary basis for what specific crime *does* involve in the individual case at hand, not just what it 'commonly involves' as a general matter." *Id.* at 721 (internal citations omitted). Here, the employment records maintained at a law office in Chelsea have nothing to do with cross-border movements, and as such, the Government does not have individualized suspicion that any evidence of a crime, one that does not even commonly involve cross-border movements, was on Plaintiff's phone.

Accepting the Government's argument means accepting that the mere possibility that a citizen, or the business that a citizen works at, has *potentially* committed a civil employment infraction allows Federal agents to seize, search, and make a copy of a citizen's cell phone without a warrant and keep that cell phone data indefinitely, meaning that it may be subjected to unlimited intrusive searches. This is concerning and inconsistent with the Constitution. Moreover, the concern is only magnified when the citizen is also an attorney who works with vulnerable immigrants in 2025. Given these facts, the temporary restraining order must remain in place during discovery in this case.

## II. Expungement of the data is the only relief that protects Plaintiff and Plaintiff's client's privileged information.

Even if the Court were to find that reasonable articulable suspicion existed that allowed the Defendants to seize and search, that does not entitle them to keep the data they extracted. The Defendants had from the time when they seized the phone until they were notified of the Court's temporary order to search the phone for evidence of criminal activity consistent with ICE policy. The Defendants' brief is silent as to whether they have already conducted their search.

11

The Court has enough information to know that the seizure of the phone, the continued seizure of the phone data, and any future warrantless search are unlawful. The Government has great resources and is not without options. Defendants have had three weeks to get a search warrant (and arguably five days to conduct a warrantless search that the Plaintiff contends would have been or was illegal). Presumably, because they do not have the evidence, they have failed to obtain a search warrant. Obtaining a search warrant is their refuge, not the removal of the TRO.[8]

For the Plaintiff, expungement of the data is the only relief that protects the Plaintiff's privileged conversations and protects the rights of the Plaintiff's clients. If an officer has reasonable suspicion to search a car and the officer finds no evidence during the search, the officer does not get to indefinitely keep the car. That is what the Government wants the Court to endorse. In this instant matter, the stakes are higher. There is much more invasive and private information that the Government had unfettered access to for five days – the law does not permit the Defendants to continue to have access to this information when the risks to the Plaintiff's clients' rights are at stake, and they have provided no information about any steps taken to protect their rights.

In fact, CBP Directive No. 3340-049A ("Directive"),[9] which relates specific to border searches of electronic devices states in § 5.1.6: "Searches of electronic devices should be conducted in the presence of the individual whose information is being examined unless there are national security, law enforcement, officer safety, or other operational considerations that make it

---

[8] At least one District Court, following extensive analysis of *Riley*, concluded "the Government may not copy and search an American citizen's cell phone at the border without a warrant absent exigent circumstances." *United States v. Smith*, 673 F.Supp. 3d 381, 394 (S.D.N.Y. 2023) (Rakoff, J.). Three weeks after the seizure, and after the Government had unfettered access (wrongly) to Plaintiff's phone for five days, this Court should conclude that a search warrant is required to do anything else with Plaintiff's phone data other than destroy the data.

[9] An honest reading of the Directive reveals that the Defendants violated it repeatedly. An inexhaustive list of examples: They made no effort to address privilege even though the Plaintiff told the Federal Agents that his phone contained privileged materials. § 5.2. After five days, CBP should have destroyed the data. Directive § 5.4.1.2. The Federal Agents provided insufficient notice of the purpose of the search and how he may redress his grievances. Direction § 5.4.1.3.

inappropriate to permit the individual to remain present." *See Exhibit D.* To the extent that an "advanced search" based on reasonable suspicion was allowed by the Directive, the Defendants should have done it at the airport.

In the civil context, a court in its discretion may order expungement for the purposes of remedying ongoing or future harm where such "is an equitable remedy designed to correct, not compensate for the violation, and may be essential to prevent harm as a result of the original violation." *Carter v. Orleans Parish Pub. Schs.*, 725 F. 2d 261, 263 (5th Cir. 1984). Here, expungement is the only relief that will correct the violation of Plaintiff's First and Fourth Constitutional rights. The exclusionary rule offers no relief where no evidence of a crime was even identified during the warrantless search, thus simplifying the factors the Court must weigh. *See United States v. Molina-Isidoro*, 844 F.3d at 290 ("the cost of suppression – excluding the evidence from the truth-finding process – outweighs the deterrent effect suppression may have on police conduct"); *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998) ("we have held [the exclusionary rule] to be applicable only where its deterrence benefits outweigh its 'substantial social costs'").  For the Government, there are no substantial social costs at risk here because no evidence of a crime was discovered. There is no reason why the Government should retain data from Plaintiff's phone after violating his rights. The social costs on the Plaintiff side of the ledger are high.  The threat is not only that on September 28, when the federal agents seized his phone, Plaintiff's rights were violated because of what he has said and whom he represents, but the ongoing threat to his and his clients' rights.

On the issue of expungement, the facts in this case are different than the facts in *Alasaad*. Here, an immigration attorney with privileged information on his phone who alleges that his phone was seized and searched for that very reason stands aggrieved. This is the precise scenario the First

Circuit did not seek to foreclose in the *Alasaad* decision. *See Alasaad*, 988 F.3d at 23, n. 17 ("Plaintiffs do not present the issue of whether the First Amendment would require a different outcome if CBP and ICE were targeting journalists or using border searches to pierce attorney-client privilege. Two plaintiffs are journalists, but they do not contend [that] they were searched by CBP for this reason. This decision does not foreclose the future as applied First Amendment challenge in such circumstances.")  The court in *Alasaad* specified that if a non-routine search was being used to pierce the attorney-client privilege, this would be an as-applied challenge. *Id.* The Federal Agents chose not to detain and search the phone of the individual who works at the Plaintiff's firm in charge of employment records but instead focused on the Plaintiff – the Plaintiff contends this was a deliberate decision and this is only amplified by the Government's unwillingness to follow their own policy when it comes to searching electronics with privileged information.

## III.    Conclusion

Plaintiff continues to need the restraining order to remain in effect as he propounds discovery to learn the identities of John Doe 1-3 and Jane Doe, the true facts and circumstances behind why he was targeted, and other facts that support his claims. The Government has provided the Court with zero information to dispel the Plaintiff's legitimate claims that privileged information on his phone will be used to target his vulnerable clients.

ANDREW LATTARULO
By his attorneys,

Dated: October 19, 2025            /s/ Mary Lemay
　　　　　　　　　　　　　　　　　Mary Lemay, BBO # 711345
　　　　　　　　　　　　　　　　　Patrick Hanley, BBO # 658225
　　　　　　　　　　　　　　　　　BUTTERS BRAZILIAN LLP
　　　　　　　　　　　　　　　　　420 Boylston Street, 4th Floor
　　　　　　　　　　　　　　　　　Boston, MA 02116
　　　　　　　　　　　　　　　　　Phone: 617-367-2600
　　　　　　　　　　　　　　　　　hanley@buttersbrazilian.com
　　　　　　　　　　　　　　　　　lemay@buttersbrazilian.com

**CERTIFICATE OF SERVICE**

  I, Mary Lemay, attorney for the Plaintiff, Andrew Lattarulo, certify that on the 19th day of October 2025, I caused the foregoing document to be served to the Defendants through the Court's CM/ECF electronic filing system.

                     /s/ Mary Lemay
                     Mary Lemay, Esq.