UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


ANDREW LATTARULO,                )
                                 )          Civil Action
          Plaintiff,             )          No. 25-CV-12861-ADB
                                 )
v.                               )
                                 )
KRISTI NOEM, in her official     )
capacity as Secretary of         )
Homeland Security, and the       )
DEPARTMENT OF HOMELAND           )
SECURITY, et al.                 )
                                 )
          Defendants.            )



           BEFORE THE HONORABLE ALLISON D. BURROUGHS
                 UNITED STATES DISTRICT JUDGE


                      STATUS CONFERENCE

                     October 20, 2025
                        1:00 p.m.


       John J. Moakley United States Courthouse
                    Courtroom No. 17
                   One Courthouse Way
              Boston, Massachusetts  02210




                         Kelly Mortellite, RPR, RMR, CRR
                         Official Court Reporter
                         One Courthouse Way, Room 3200
                         Boston, Massachusetts  02210
                         mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Plaintiff:
Patrick M. Hanley
Mary Lemay
Butters Brazilian LLP
420 Boylston Street, 4th Floor
Boston, MA 02116
617-367-2600
hanley@buttersbrazilian.com


Counsel on behalf of Defendant:
Eve A. Piemonte
U.S. Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3100
eve.piemonte@usdoj.gov

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Allison D. Burroughs, United States District Judge for the District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Courtroom 17, Boston, Massachusetts, on October 20, 2025.)

(Case called to order.)

COURTROOM CLERK:  Will counsel identify themselves for the record.

MR. HANLEY:  Sure.  Good afternoon.  My name is Pat Hanley.  I represent Andrew Lattarulo, who is present, and with me is --

MS. LEMAY:  Attorney Mary Ellen Lemay, who also represents Attorney Lattarulo.

MS. PIEMONTE:  Good afternoon, Your Honor.  Eve Piemonte on behalf of the defendants.

THE COURT:  All right.  So I'm not exactly sure where we are procedurally.  The motion for return of property is mooted by the fact that the property has been returned, and we have the pending injunction motion, which is sort of keeping things in abeyance at the moment.

And I know that you're requesting that the information that you have be destroyed -- that the government has be destroyed, but I'm not sure if that's part and parcel of the injunction motion or requires a separate motion.  I'm just not

sure.

MR. HANLEY:  I think that if the court concludes that -- I think it's part and parcel, to answer your question.  And I think if the court concludes that the search and continued seizure, either the search or continued seizure are unreasonable, that's a remedy that the court could give now.

THE COURT:  Does it require a separate motion to suppress in your view?

MR. HANLEY:  In a criminal case, I think yes.  I think in this case no, because the continued detention of his phone data is the harm.  It's been paused.  I also don't know if a search has been already conducted of the data itself, in other words, search terms and stuff you would expect to happen.  And I think that would bear on what the court's decision is here because it would bear on whether there's any continued need, and it would bear on the potential harm to the government.

THE COURT:  Okay.  I've just been trying to think this through and I'm not really sure what's on my plate at the moment, but one could conceive of a situation where I let them hold the data, we see if there's a criminal case, and then -- because there's no harm in the holding of the data.  There's no harm to anybody if they just hold it.

MR. HANLEY:  As long as they're not searching it, I think that's right.

THE COURT:  Right, even if they've searched it but

don't do anything with it.  I'm going hear from everyone more fulsomely, but I think she said last time there was a taint team.  So that data, even if it's been searched, if it's been isolated, we could hold it.  And then if there is a criminal case, there would be a proper motion to suppress, right?

MR. HANLEY:  That's true.  In order of priority, we'd clearly like it expunged, but next in line is the status quo.  Hopefully there is no criminal case because, as you can tell from the filings, there's an I-9 inquiry going on right now that I think there's honest back and forth going on between the law firm and the government.  Maybe it gets resolved that way; I don't really know.

THE COURT:  A border search is normally contested with a motion to suppress, right?  And I understand there's no criminal case, so that may not be the right procedural step here.  I'm just trying to kind of work it out.

MR. HANLEY:  Right.  The cases we cite I think are probably 50 percent criminal cases, 50 percent some other action like this.  Like the *Alasaad* case -- I plan to talk about a bunch -- is ten people who had their phones temporarily seized, most of them for like 45 minutes or 90 minutes, then the phones go back, and I think they're not routine.  But the relief that those people were seeking was prospective to when they next leave the country, for example.  Ours is limited to this phone in this case.  We're not asking the court to do

anything with respect to any time Mr. Lattarulo plans to travel internationally.

THE COURT:  Okay.  Let's hear from you, Ms. Piemonte.

MS. PIEMONTE:  Your Honor, at least from the defendant's viewpoint, before the court today is the remaining issue of the data that's been retained as part of the border search.  So I think then what happens with that data is now before the court.

And then I think you saw in the opposition, the defendant's opposition to the continuing injunctive relief that's requested, they're requesting destruction or expungement of the evidence, and it's the defendant's position or the government's position that expungement is not warranted in the setting of what's alleged to be constitutional violations.

The government agrees that suppression is the more appropriate remedy later on down the line; meaning, when I say "remedy," relief requested and/or remedy provided by the court should there later on be criminal proceedings resulting from --

THE COURT:  When you talk about the data, have you separated out what's like sort of attorney-client or his client information from whatever might be on there about employment?

MS. PIEMONTE:  Currently, Your Honor, it's my understanding that, given the court pretty quickly entered an order restraining use of the information that had been collected, so when we talk about the data, my understanding is

that it extracted it.  Meaning, HSI extracted basically a mirror image of a phone when, right, it's not connected to the internet, et cetera, basically the digital version of the phone, and then returned the physical phone back to Mr. Lattarulo.

In terms of, so the copy of the phone was made.  I understand that it's currently secured in evidence, as evidence and that no action is taken at this time pending the court's ruling on the motions.  It's in a preserved format, which is not readable or reviewable at this time.

THE COURT:  Has it been searched at all?

MS. PIEMONTE:  No.

THE COURT:  Copied?

MS. PIEMONTE:  So the search -- it's the copy that's considered the advanced search definition, using the manual search at the border, which would be the officer just manually flipping through the phone while it's on airplane mode.  The policies define an advanced search as using equipment to extract information from the phone.

So when I say, "advanced search," I'm talking not about a search of the contents but the advanced search as defined by the policy, which is that information from the phone -- in this case I'm told a copy of the phone -- was extracted using digital equipment.

THE COURT:  It's been extracted but not reviewed

beyond that?

MS. PIEMONTE:  That format, I'm being told, is in a preserved format that's not readable or reviewable.

Now, if the court does not enter a permanent restraining order, HSI would convert that phone or the data to a readable format and then search it under the reasonable suspicion of the border search.  Recognizing that there's a claim for attorney-client communications or privileged information on that phone, there would be a taint team that would be constituted to separate out information.

THE COURT:  So just out of curiosity, how would the taint team -- say there's a bunch of names and phone numbers on the phone.  How does the taint team identify the difference between a client and a -- how would they distinguish between the name and phone number of somebody who might be unauthorized to work here versus the name and phone number of a client?  There could be overlap between those two categories, right?

MS. PIEMONTE:  There could be.  And I think that that is something that occurs down the road potentially with criminal prosecutor, agents.  I envision there may or may not be with -- in the policy I believe there's some citation to input from the phone's owner or their attorneys, so I can't say with specificity.  But it is the way any other taint team in any other kind of case may operate.  I'm sorry that I have to be general.

THE COURT:  That's fine.  And do you know -- I mean, what I'm taking from the filings is that you're saying there was reasonable suspicion to grab this phone.  How did the border agents know about that reasonable suspicion?

MS. PIEMONTE:  Well, at least from the filings that have been filed there's an HSI special agent.  If you compare the documents on there, the notice of suspect documents, the return of those documents identifies an HSI special agent, whom I understand was the HSI special agent at the border search.

THE COURT:  All they've gotten is basically like a civil demand letter, right?  I know that's not the exact terminology, but they've gotten that.  That's kind of like a routine, civil administrative start to an investigation.  Are all those names communicated to border agents?

MS. PIEMONTE:  Again, the agent receiving that information was the agent at Logan Airport.

THE COURT:  But what caused that information to be transmitted to him?

MS. PIEMONTE:  I can't --

THE COURT:  You don't know or you can't say?  You don't know or you can't say?

MS. PIEMONTE:  I may not have heard your question correctly.  What caused the information --

THE COURT:  What caused Mr. Lattarulo's name to be sent to the border people?

MS. PIEMONTE:  I can't say, Your Honor.

THE COURT:  You can't say or you don't know?

MS. PIEMONTE:  I can't say.

THE COURT:  Okay.

MS. PIEMONTE:  I realize, Your Honor, it's why we dropped the footnote about if the court doesn't find reasonable suspicion, the government would request --

THE COURT:  Right.  I saw the footnote.

MS. PIEMONTE:  Okay.

THE COURT:  All right.  I mean, there's obviously -- I mean, I'm going to hear from you, too.  There's obviously competing demands here.  Assuming for the moment that they have a legitimate investigation going on, I don't want to hamstring or hamper that investigation on the one hand.

On the other hand, he's got clients that have an equally legitimate right not to have their names and contact information made available to the government merely because their lawyer happens to either be involved in activity they're investigating or happen to travel internationally, right?

I mean, I could make a pretty good argument that the safest thing to do would be to leave the data where it is unlooked at until we sort out what the actual situation is.  I can look at their information in camera, but that has its own complications for the plaintiff.

MR. HANLEY:  I mean, if the government is willing to

maintain the status quo of it's frozen and nobody can look at it, I think that would be acceptable.  I'm not sure if I'm hearing that from the government.

THE COURT:  I thought I heard that from the government.  Yes, Ms. Piemonte?

MS. PIEMONTE:  I don't think, Your Honor, I can -- I can't say that today.  I can say it currently is in that preserved state.  If the court does not enter the restraining order and making it a permanent restraining order, it's my understanding that HSI wanted to convert it to a readable format and provide the phone to a taint team, and that was that process that I just described, the phone information to a taint team.

And, you know, Your Honor, it goes back to HSI's position that this is a border search supported by reasonable suspicion.  And there is that fine line, right, between what can and can't be done with information obtained from such a search.

THE COURT:  Well, I've had to think about this issue before in the context of another case, and it raises the spectre of like a pretextual border search, right?  Someone that you are interested in for whatever the reason, you set up a border search as a pretext where people's rights are diminished.  And if you searched his phone because he's suspected of engaging in some kind of activity that the

government is legitimately investigating, that's one thing. But if you grabbed his phone because he's an immigration attorney who has been vocal in all the things that he puts in his papers, that's another thing. I'm not sure that I have enough information to sort that out. So my options -- I mean, do either one of you think I have enough information to sort that out at the moment?

MR. HANLEY: I do.

THE COURT: How do you think -- let's assume for the moment, I mean, it's either a criminal investigation, there's a civil investigation, or it's all pretext, right? How do you think I have enough information to sort that out?

MR. HANLEY: If I can, sure. I would sort of go back to the standard for an injunction. The first prong is likelihood of success on merits. We've offered two affidavits from two lawyers, the plaintiff and his partner, and documents including the communications.

THE COURT: The merits of what?

MR. HANLEY: The merits that the plaintiff can show that this was either a pretextual stop, which is option number one, or that there's no reasonable suspicion because this is civil, which is option number two, which is an oversimplification. And based on that showing, the court can conclude that there's a likelihood of success on the merits.

I think we hit the other prongs pretty quickly. I'd

go through them.  But what has come back from the government on the other side is -- we're learning today that the agent identified in the paperwork is also the agent in the airport. That's not in any of the filings.  There's no affidavit from anybody in the United States government saying what they knew, when they knew it and why they acted upon it.

And because there's an absence of that -- and the United States had plenty of notice to do this.  They knew that they were going to conduct a border search of an attorney when they showed up at the airport waiting for his plane to arrive. There was obviously planning in place for this to happen.

And the fact that arguably now there's a connection between the agent involved in the I-9 and perhaps the same person at the airport, that shows that they've known at least since I think September 8 or 9 when they sent the I-9 notice to the firm that they're doing this investigation.

That's why -- so you get back to either it's a pretext to search his phone related to I-9, which is civil, or it's a pretext to get to his phone, Mr. Lattarulo, not his partner, Attorney Cote, who had been there the day before and was the person engaging with HSI on this issue.

So that's why I'd suggest you have enough information to at least maintain the status quo, if not expunge, but at least maintain the status quo so that it remains in this locked, unsearchable format and nobody can go into it.

THE COURT:  Well, they may have an affidavit.  She's just not willing to share it here.  So that could push me towards an in-camera review of what she actually has.

The safest thing to do is to just maintain the information as it is.  But he's correct, under the injunction standard, I need to make a finding of likelihood of success on the merits, and I'm not sure I have enough information to go one way or another on that.

MS. PIEMONTE:  Well, Your Honor, the claims in the complaint and in the motion for injunctive relief state that he's targeted merely because he's an immigration attorney who is outspoken against the administration and that the search occurred in violation of his First and Fourth Amendment rights.

The notice of inspection itself is evidence that there was something other than that happening.  There was an investigation.  Whether it's civil or criminal, both of those penalties apply.  But there was concern about the employment practice at the law firm where he is a 50 percent owner.

Fine, he received that notice of inspection.  The firm produced documents.  From the documents produced there were 117 current or former employees of the firm, and the discrepancies were that the documents didn't match the name of the person, didn't --

THE COURT:  I understand, I understand an I-9 investigation.

MS. PIEMONTE:  So on that basis alone there's reasonable suspicion of violation of 8 U.S.C. 1324(a), the unlawful employment of aliens, as it's entitled.

THE COURT:  What do you think you're going to find on his phone with regards to that?

MS. PIEMONTE:  Your Honor, I only get to reasonable suspicion.  I think when you look at -- and I just want to back up for just one second, if I may, Your Honor.  The position that there's a likelihood of success on the merits because you can't have suspicion because it's civil, that's not -- the border search, it unduly narrows the authority for a border search because that border search authority includes activity in violation of laws enforced by CBP or ICE.

So if you have a law firm and the 50 percent owner who is a principal in the firm and that firm is potentially employing people who are unauthorized to work in the United States, there's reasonable suspicion to conclude that there may be evidence of employment of those persons unauthorized on that phone, because it's not a quantum leap to suggest that a phone would be used for conducting firm business from the 50 percent partner who is the principal at the firm.

THE COURT:  So I am not familiar with any situation where there's been a search warrant for a phone because someone is suspected of I-9 issues.  So his phone got grabbed because presumably somebody made the determination that this was

fortuitous that he was coming across the border and they could grab the phone with something less than a search warrant.  And, you know, I mean, I know what the statute says about the scope of border searches, and I know they're quite broad.

As I said, I've looked at this issue before in the context of another case, but the whole purpose of the border searches are really to keep contraband from coming in or out of the United States.  That's the purpose of a border search. It's not supposed to be that you can grab anything that you couldn't grab anywhere else because somebody happens to travel. It's not supposed to be about a pretext.

MS. PIEMONTE:  Well, I think pretext is different from the analysis.  And I apologize I did not include this in my brief, the court referenced during the hearing an the Eastern District of New York case, and I mistakenly thought it had been cited in the *Alasaad* case.  There were District of New York, Western and other districts of New York, but there are a number of Eastern District of New York cases that go both ways, that cut both ways in this case.

Before today's hearing, I did look up the case of *United States v. Saltinov*, which I assumed may be the case that the court was referring to.

THE COURT:  Yeah.

MS. PIEMONTE:  And I respectfully suggest that that case is a bit of an outlier for a few reasons, Your Honor.

First of all, when *Saltinov* was decided, the Second Circuit had not decided the issue of border searches of cell phones.  And here, the First Circuit has decided the authority.  The *Saltinov* case cites the cases that I thought you were referring to in the first hearing.

The *Saltinov* court also acknowledges that there was dissension amongst the district courts in the Eastern District of New York about the scope of the authority.  And the *Saltinov* court actually disagreed with all circuit courts -- so forget about the district courts, they disagreed with all circuit courts to have considered the issue -- and held that both a warrant and probable cause was required for a search of the phone at the border.

Here, Your Honor, you have *Alasaad*, which considered *Riley*, and it's this circuit's precedent.  So I did want to address that with Your Honor as you asked me to do.

THE COURT:  What's going on with *Saltinov*, do you know?  Has that been appealed?

MS. PIEMONTE:  I actually did not see an appeal on it. I only saw that -- I did not see an appeal on it, so I don't know.  I only saw that it had distinguished *Alasaad*, and I pulled that.

So, Your Honor, it's in that context that if HSI saw an opportunity and decided to take it, I don't think that this is pretextual.  I think there's sufficient evidence before the

court of either a civil or a criminal investigation but an investigation nonetheless and that the evidence that turned up with those documents and upon review of HSI gave HSI the reasonable suspicion to stop the plaintiff at the border as he cleared the runway and was at the gate there.

THE COURT:  You're unwilling to agree to maintain the status quo while we figure out -- while you guys figure out what kind of investigation you have, what the evidence is?

MS. PIEMONTE:  I don't want to make it personal.

THE COURT:  It's not personal.

MS. PIEMONTE:  It's not me personally.

THE COURT:  No.  I understand.

MS. PIEMONTE:  But there were client discussions, and I think the tension, Your Honor, is the precedent as well that it would set for future border searches.

THE COURT:  Well, this one is unusual because it's an attorney, right?

MS. PIEMONTE:  Right, but so was *Malik*, the Fifth Circuit case that we cited in the brief.  There was a different kind of connection, but there was a connection in the *Malik*, *Malik* case.  And there's concern about kind of the separation between the court's involvement in border searches and what can happen at border searches.

And I maintain that the relief and potential remedy is, if there were a criminal investigation, it would be

suppression and that anything more would hamper investigative efforts by the agencies involved, which is why I come to you with the position after conferring with all.  There are protections set up.

THE COURT:  So if the issue is -- I'm still not quite clear about likelihood.  We're talking about likelihood of success on what?  But let's say that we figure that out.  How do I make sure that the rights of his clients are not infringed by me allowing the government to search the phone?

MS. PIEMONTE:  If you mean while the disclosure of the privileged information happens via a taint team --

THE COURT:  I don't understand how on a phone you can distinguish between the name and phone number of a client versus the name and phone number of anybody else.

MS. PIEMONTE:  I understand that, Your Honor, but it happens routinely when there are search warrants that are executed and may contain privileged information, whether it's an accountant's office or an attorney's office.

THE COURT:  But just the name is arguably privileged. You know what I mean?  It's not like you're going to look at something and it's going to be "Memo to client from attorney," right?  That's not what we're going to see.

MS. PIEMONTE:  I understand, and there was some citation that there's a cooperative effort that occurs.  But how in this particular case, I just can't -- I know there's a

taint team process.  I know that it's happened before, and that would be the protection.

THE COURT:  Anything else you want to be heard on today?

MR. HANLEY:  Sure.  Counsel mentioned that when there's a search warrant done and there's privileged information, there's a taint team.  Here is the difference. There's a search warrant.  And that protocol, assuming the court knows that there's going to be privileged information, is subject to court approval as well.  Here, there's blind reliance on HSI to go through his phone and look for I-9 information, whatever that would be, and ignore attorney-client contact information and names.

THE COURT:  Hold on.  If the search is valid, you can have a valid search pursuant to a warrant, but you could have an equally valid search pursuant to the border exception.

MR. HANLEY:  Right, but in terms of the reference to a protocol, when it's a search warrant, it's a protocol that the court has the opportunity to consider.  Here, it's that HSI is going to, I suppose, engage in a protocol that is in their policy that, if there is engagement with counsel, in order for us to engage with them, we'd have to provide the name and phone number of his clients, and that's an untenable position for us to be in.  And we shouldn't be in that position because there is no reasonable suspicion.  And we haven't talked about it

today, Judge, but the --

THE COURT:  Well, theoretically, they could take the names of the 109 people and just search for that name and number, right?

MR. HANLEY:  Yes, but what would they do with it?

THE COURT:  Well, I'm just saying that protects the clients, arguably.

MR. HANLEY:  Sure, but Judge -- yes, yes, they could do it that way.  The employee names, that's what you mean.

THE COURT:  Yes.

MR. HANLEY:  All right.  I suppose that's possible. It may be that some clients or former clients had been employees or vice versa.  But I suppose that's conceivably possible, maybe with some caveats.

I'd just like to go through a couple of other things that were raised.  One, the suppression cases weren't client cases.  You know, the *Malik* case was one kind of flipped like this, where the attorney sues.  The difference was, in the *Malik* case, by the time it reached the decision that ultimately the circuit court was reviewing, was a summary judgment decision, and *Malik* was asking for more relief than we're asking for here.  And all the searches had already taken place.

It was not at the stage where you're at now, Judge, which I recognize is harder, but it is much earlier in the process, a couple of weeks after the seizure of the phone

itself.  In that case it was much, much later in the process. And the government was, subject to the lawsuit going away, agreeing to expungement in the *Malik* case.  So I just think that's a different case.

The other thing I'd like to mention, if you wouldn't mind, Judge, is we don't agree this is a border search.  And I know that it's almost taken as a given that it's a border search, but the border search happened in Aruba.  He went through customs.  According to the *U.S. v. Montoya de Hernandez* case that's cited in our brief, the first place of contact is the functional border.  So not anywhere in Logan Airport, after he's already been through the normal customs process in Aruba that most of us go through if we travel internationally, go through at Terminal E at Logan Airport.  He flies in like any other passenger coming from Miami or Las Vegas or New York, he comes into terminal C, a domestic terminal.

As you can see from the video, Your Honor, he's just in the area where people wait for flights.  It's not in the customs area that, if you've flown internationally, and I assume you have, is very official.  There's a box.  People are running passports.  That's not where they are because that had already happened.

And it's unreasonable that the government should get a second bite at the apple after, in Aruba, several hours earlier, he goes through customs, he sits and he waits for his

plane.  They let him on the plane.  There's obviously no national security risk.  There's no cross-border crime issue. There's no contraband issue.  They don't pat him down.  They don't search through his bags at Logan Airport.  They seize the phone in his hand.  And they have plenty of notice in order to do it.

So I'd say, one, it's not a border search.  But two, the scenario I just laid out shows why it's not reasonable, and there's no reasonableness exception to the Fourth Amendment. There's only a warrant exception.  But here, I would suggest that warrant exception shouldn't apply.  And footnote 17 in the *Alasaad* case suggests that an attorney in this position, it really flagged this position, and as applied, targeting of an attorney would receive a different analysis than occurred in *Alasaad*, which were people that didn't want to be searched next time they traveled.

So I'd suggest there are real meaningful differences here that I think arm this court with enough to decide and decide our way.

MS. PIEMONTE:  Your Honor, the position is overly narrow.  So to answer the court's previous question in terms of what happens with the information, I did locate the ICE search policy that I was referencing before.  And at least under the border search policy -- and again, a claim of privilege or personal information doesn't prevent the search of a traveler's

information at the border.  This is their policy, which I would be happy to file under seal.

It's subject -- certain pieces of information are subject to special handling by special agents, and one of those pieces of information is legal information.  And the policy says that if a special agent suspects the contents of such a document constitute evidence of a crime or pertain to a determination within the jurisdiction of ICE, then ICE's chief counsel or the appropriate U.S. Attorney's Office must be contacted before beginning or continuing a search of the document, and then the consultation is noted in the systems, et cetera.  So the policy contemplates specifically this collaboration or cooperation that I mentioned with counsel should privileged information be recognized in the search.

Next, the idea that preclearance never suggests -- never allows for a subsequent border search, it's cited in the government's brief, or the defendant's brief, at footnote four, 19 C.F.R 162.6 provides that even if a person has been pre-cleared in one point, they are subject to a border search upon arrival in the United States.

Also, Article 5 of the agreement between the United States and the Netherlands on behalf of Aruba also says it specifically contemplates, again at Section 5, specifically contemplates continued inspections upon arrival in the United States.

Because the airport is the functional equivalent of a border, it's at any point in the airport.  It's not until you've cleared that front door of the airport that you are no longer in the international border.  And that's the position of HSI and CBP.

I don't want to belabor any other point, but I did want to address those two points made by the plaintiff.

THE COURT:  All right.  So I'm going to take it under advisement.  I want the phone to stay un-further-looked-at while it's under advisement.  Do I need to put that in a written order?

MS. PIEMONTE:  No, Your Honor.  I'll communicate that.

THE COURT:  So we'll just maintain the status quo until we get a decision out.  It would be very tempting to not get the decision out for a couple of years, but we will not succumb to that temptation, and we'll kick it out as soon as we can.  Okay?

MS. PIEMONTE:  So you would like it maintained in its current status pending further order of the court?

THE COURT:  Yes.  I think of this as a seizure.  I know your terminology is different.  You talk about like a pre-search and then a search.  I think of it as being seized at the border and searched later.  And it's been seized.  I don't want it searched beyond what's happened.

MS. PIEMONTE:  I understand, Your Honor.

THE COURT:  So your terminology might be different, but that's what I want.  I'm presuming it's in a little locked box someplace, and I want it to stay there.

MS. PIEMONTE:  It is secured in evidence, and it's in a format that's not readable or reviewable.  So I will communicate with HSI and the involved parties that it's to be maintained in its current state currently secured as evidence and not readable or reviewable.

THE COURT:  Exactly.

MR. HANLEY:  The court's current order remains in effect.

THE COURT:  Yes.

MR. HANLEY:  Yes.  All right.  Thank you.

THE COURT:  Okay.  All right.  Thanks, everyone.  Interesting issue.

MR. HANLEY:  Thank you, Your Honor.

MS. PIEMONTE:  Thank you, Your Honor.

MS. LEMAY:  Thank you, Your Honor.

(Adjourned, 1:37 p.m.)

CERTIFICATE OF OFFICIAL REPORTER


          I, Kelly Mortellite, Registered Professional

Reporter, Registered Merit Reporter and Certified Realtime

Reporter, in and for the United States District Court for the

District of Massachusetts, do hereby certify that the foregoing

transcript is a true and correct transcript of the

stenographically reported proceedings held in the

above-entitled matter to the best of my skill and ability.

                    Dated this 7th day of January, 2026.


                    /s/ Kelly Mortellite

                    _____

                    Kelly Mortellite, RPR, RMR, CRR

                    Official Court Reporter